Filed 10/5/15; pub. order 10/23/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SAN PASQUAL BAND OF MISSION INDIANS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>STATE OF CALIFORNIA et al.,<br><br>    Defendants and Respondents. | B254870<br><br>(Los Angeles County<br>Super. Ct. No. BC431469) |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Ruth Ann Kwan, Judge.  Affirmed.

Solomon, Saltsman & Jamieson, Stephen Warren Solomon, Stephen Allen Jamieson and Ryan Michael Kroll for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Sara J. Drake, Assistant Attorney General, Peter H. Kaufman and Jennifer T. Henderson, Deputy Attorneys General, for Defendants and Respondents.

\* \* \* \* \* \* \* \* \* \*

Plaintiff and appellant San Pasqual Band of Mission Indians (San Pasqual) appeals from the entry of summary judgment in favor of defendants and respondents State of California and the California Gambling Control Commission (the State). In September 1999, San Pasqual and the State entered into a written contract (the Compact) governing San Pasqual's operation of a casino on its land in San Diego County. San Pasqual contends the Compact authorized it to operate up to a maximum of 2,000 slot machines at its casino, but the State wrongfully refused for several years to issue it the requisite number of gaming licenses, resulting in $315,000,000 of lost profits.

San Pasqual filed two lawsuits against the State that were consolidated, alleging breach of contract and seeking damages for five years of lost profits. The State successfully obtained summary judgment in the consolidated action on the grounds a provision in the Compact bars monetary damages as a remedy to either party in any action arising under the Compact. San Pasqual contends the court misinterpreted the provision, failed to consider admissible extrinsic evidence relevant to a proper interpretation of the provision, and erroneously resolved disputed factual issues.

We affirm.

<strong>FACTUAL AND PROCEDURAL BACKGROUND</strong>

Despite the large volume of materials presented in the appellate record, this appeal raises a relatively narrow issue; it challenges only the one ground upon which the trial court granted summary judgment. Bearing in mind the limited scope of this appeal, we limit our recitation of the evidence and procedural history to that which is relevant to the issue raised on appeal.

**1.     Historical Background and Relevant Federal Law**

To provide context for the parties' dispute and our discussion, we summarize the background facts, relevant federal law regarding tribal gaming and prior related litigation.

In 1988, Congress passed the Indian Gaming Regulatory Act (the Act) (25 U.S.C. § 2701 et seq.), in part, to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." (§ 2702(1).) The Act divides gaming into three classes. At issue

2

here is Class III gaming which includes slot machines and other electronic gaming devices. (§ 2703(7)(B) & (8).) In order for an Indian tribe to conduct Class III gaming on its land, the Act requires a written contract or "tribal compact," authorizing such gaming, between that tribe and the state in which its land is located. (§ 2710(d)(1)(C).) The Act also requires that the state generally "permits such gaming for any purpose by any person, organization, or entity." (§ 2710(d)(1)(B).)

California's Constitution provides that the "Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19(e).) After the passage of the Act, the State therefore took the position that it need not negotiate with tribes pursuant to the Act for the right to conduct Class III gaming, because such gaming was not generally permitted in California within the meaning of the Act. (*Coyote Valley Band of Pomo Indians v. California* (9th Cir. 2003) 331 F.3d 1094, 1097-1099 (*Coyote Valley*).)

"A coalition of California tribes drafted and put on the November 1998 State ballot Proposition 5" authorizing Class III gaming on tribal land. (*Coyote Valley*, *supra*, 331 F.3d at pp. 1099-1100.) Proposition 5 passed and was codified at Government Code sections 98000 through 98012. However, the Supreme Court concluded Proposition 5 was invalid because it conflicted with the constitutional prohibition against gaming in article IV, section 19, subdivision (e). (*Hotel Employees & Restaurant Employees International Union v. Davis* (1999) 21 Cal.4th 585, 615-616.)

Concerned that several tribes had already put some gaming devices into operation and would be "vulnerable to federal prosecution" (*Coyote Valley*, *supra*, 331 F.3d at p. 1102), then-Governor Davis began negotiations with California tribes pursuant to the Act (*id*. at pp. 1101-1102). The State also proposed a constitutional amendment allowing for gaming on Indian lands (Proposition 1A). To facilitate the negotiations, California tribes formed three negotiating teams, including the United Tribe Compact Steering Committee (the Committee). (*Coyote Valley*, at p. 1102.) The Committee was composed of approximately 80 tribes, including San Pasqual. The Committee proposed "the model compact contained in Proposition 5 [as] its opening offer." (*Ibid.*)

3

In September 1999, after several months of negotiations, the State executed 61 tribal compacts with tribes throughout California, including San Pasqual. Proposition 1A, the constitutional amendment allowing gaming on tribal lands, passed in March 2000. (Cal. Const., art. IV, § 19, subd. (f).)

The 61 tribal compacts were "substantively identical" and "authorized Class III gaming." (*Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California* (9th Cir. 2010) 618 F.3d 1066, 1068 (*Colusa II*).) The tribal compacts provided that those tribes that already had gaming devices in operation could continue to operate those existing devices as a matter of right. For tribes, like San Pasqual, that did not have gaming devices in operation as of September 1999, the compacts specified they were entitled to operate up to 350 gaming devices as a matter of right. (Compact Sec. 4.3.1.) (*Colusa II*, at p. 1071.) For each additional gaming device a tribe sought to operate, up to a maximum of 2,000, the tribe had to apply for a license. A separate license was required for each individual device. (Sec. 4.3.2.2.) Licenses would be allocated to tribes from a statewide pool of licenses according to a "detailed draw process." (*Calussa II*, at p. 1071.)

The license draws were initially operated by a third party entity. (*Colusa II*, *supra*, 618 F.3d at p. 1071.) "In 2001, following complaints regarding the accounting and administration of the draws . . . , [then-Governor] Davis issued an executive order creating the California Gambling Control Commission" to take over the license draw process. (*Ibid*.)

Shortly thereafter, a dispute arose between the State and the tribes, including San Pasqual, about the total number of licenses that were available for distribution among the compact tribes. The tribal compacts did not specify what that number would be, but instead, set forth a formula, in Section 4.3.2.2. of the Compact, for calculating that

4

number.[1]  The State "adopted an interpretation [of Section 4.3.2.2.] that authorized a license pool of 32,151 licenses."  (*Colussa II*, *supra*, 618 F.3d at p. 1071.)

San Pasqual, along with several other tribes, sought declaratory relief in federal court.[2]  The tribes agreed that the formula in Section 4.3.2.2. of the Compact set a ceiling on the total number of licenses available statewide, but contended the State was unreasonably interpreting the formula to arrive at a low number that deprived tribes of their full allotment of 2,000 slot machines.  (*Colusa II*, *supra*, 618 F.3d at p. 1069.)  In *Colusa II*, the Ninth Circuit determined the total number of licenses that could be issued statewide through the license draw process was 40,201, providing for an additional 8,050 licenses to be distributed statewide to eligible tribes.  (*Id.* at pp. 1081-1082, 1085.)

During the time the State maintained its position that only 32,151 licenses were available in the pool, San Pasqual submitted multiple applications seeking to obtain its full allotment of licenses.  San Pasqual submitted applications in the draws held in September 2002, July 2003, December 2003, October 2004, October 2005, August 2006, October 2007 and December 2008.  San Pasqual received 72 licenses in the October 2004 draw, but as of 2008, it was still "short" 428 licenses.

San Pasqual obtained 428 licenses in the October 2009 license draw resulting in its ability to finally operate 2,000 slot machines at its casino.

---

[1]  Section 4.3.2.2.(a)(1) of the Compact provides:  "The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact Tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized by Section 4.3.1."

[2]  San Pasqual's federal court action, filed in the southern district of California, was titled *San Pasqual Band of Mission Indians v. State of California*, case No. 06CV0988 LAB (AJB).   Following the Ninth Circuit's decision in *Colusa II*, the State and San Pasqual stipulated to dismiss San Pasqual's declaratory relief action without prejudice on the grounds the *Colusa II* decision mooted the action.

**2.    The September 1999 Compact Between San Pasqual and the State**

The Compact between the State and San Pasqual is 39 pages long.   San Pasqual's chairperson, Allen Lawson, was San Pasqual's "primary tribal representative" during the negotiations, and he signed the Compact on behalf of San Pasqual.  Then-Governor Davis executed the Compact on behalf of the State and the Legislature ratified it thereafter. (Gov. Code, § 12012.25, subd. (a)(40).)  The Compact became effective in May 2000, when the Secretary of the Interior published approval of the executed Compact in the Federal Register in accordance with the Act.  (25 U.S.C. § 2710(d)(8)(A); 65 Fed.Reg. 31189 (May 16, 2000).)

The parties dispute the meaning and purpose of Section 9.4 of the Compact, a subdivision of Section 9.0 which covers dispute resolution.  Because Section 9.4 must be read in context, and not in isolation, we set forth the full text of Section 9.0.

"Sec. 9.0.  DISPUTE RESOLUTION PROVISIONS.

"Sec. 9.1.  Voluntary Resolution; Reference to Other Means of Resolution.  In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that occur under this Gaming Compact by good faith negotiations whenever possible.  Therefore, without prejudice to the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the parties hereby establish a threshold requirement that disputes between the Tribe and the State first be subjected to a process of meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of performance and compliance by each other with the terms, provisions, and conditions of this Gaming Compact, as follows:

"(a)  Either party shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth, with specificity, the issues to be resolved.

"(b)  The parties shall meet and confer in a good faith attempt to resolve the dispute through negotiation not later than 10 days after receipt of the notice, unless both parties agree in writing to an extension of time.

"(c) If the dispute is not resolved to the satisfaction of the parties within 30 calendar days after the first meeting, then either party may seek to have the dispute resolved by an arbitrator in accordance with this section, but neither party shall be required to agree to submit to arbitration.

"(d) Disagreements that are not otherwise resolved by arbitration or other mutually acceptable means as provided in Section 9.3 may be resolved in the United States District Court where the Tribe's Gaming Facility is located, or is to be located, and the Ninth Circuit Court of Appeals (or, if those federal courts lack jurisdiction, in any state court of competent jurisdiction and its related courts of appeal). The disputes to be submitted to court action include, but are not limited to, claims of breach or violation of this Compact, or failure to negotiate in good faith as required by the terms of this Compact. In no event may the Tribe be precluded from pursuing any arbitration or judicial remedy against the State on the grounds that the Tribe has failed to exhaust its state administrative remedies. The parties agree that, except in the case of imminent threat to the public health or safety, reasonable efforts will be made to explore alternate dispute resolution avenues prior to resort to judicial process.

"Sec. 9.2. Arbitration Rules. Arbitration shall be conducted in accordance with the policies and procedures of the Commercial Arbitration Rules of the American Arbitration Association, and shall be held on the Tribe's land or, if unreasonably inconvenient under the circumstances, at such other location as the parties may agree. Each side shall bear its own costs, attorneys' fees, and one-half the costs and expenses of the American Arbitration Association and the arbitrator, unless the arbitrator rules otherwise. Only one neutral arbitrator may be named, unless the Tribe or the State objects, in which case a panel of three arbitrators (one of whom is selected by each party) will be named. The provisions of Section 1283.05 of the California Code of Civil Procedure shall apply; provided that no discovery authorized by that section may be conducted without leave of the arbitrator. The decision of the arbitrator shall be in writing, give reasons for the decision, and shall be binding. Judgment on the award may be entered in any federal or state court having jurisdiction thereof.

"Sec. 9.3. No Waiver or Preclusion of Other Means of Dispute Resolution. This Section 9.0 may not be construed to waive, limit, or restrict any remedy that is otherwise available to either party, nor may this Section be construed to preclude, limit, or restrict the ability of the parties to pursue, by mutual agreement, any other method of dispute resolution, including, but not limited to, mediation or utilization of a technical advisor to the Tribal and State Gaming Agencies; provided that neither party is under any obligation to agree to such alternative method of dispute resolution.

"Sec. 9.4. Limited Waiver of Sovereign Immunity. (a) In the event that a dispute is to be resolved in federal court or a state court of competent jurisdiction as provided in this Section 9.0, the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that: [¶] (1) The dispute is limited solely to issues arising under this Gaming Compact; [¶] (2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought); and [¶] (3) No person or entity other than the Tribe and the State is party to the action, unless failure to join a third party would deprive the court of jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe of the State in respect to any such third party.

"(b) In the event of intervention by any additional party into any such action without the consent of the Tribe and the State, the waivers of either the Tribe or the State provided for herein may be revoked, unless joinder is required to preserve the court's jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State in respect to any such third party.

"(c) The waivers and consents provided for under the Section 9.0 shall extend to civil actions authorized by this Compact, including, but not limited to, actions to compel arbitration, any arbitration proceeding herein, any action to confirm or enforce any judgment or arbitration award as provided herein, and any appellate proceedings emanating from a matter in which an immunity waiver has been granted. Except as

8

stated herein or elsewhere in this Compact, no other waivers or consents to be sued, either express or implied, are granted by either party."

**3.     Procedural History**

San Pasqual filed two lawsuits in Los Angeles Superior Court, that were consolidated, seeking damages for lost profits allegedly caused by the State's breach of the Compact.  San Pasqual sought lost profits of $115,000,000 related to the December 2008 license draw, and an additional $200,000,000 in lost profits related to all of the draws between July 2003 and December 2008 in which it failed to obtain the full number of licenses for which it applied.

Thereafter, the State filed a motion for summary judgment in the consolidated action, raising numerous grounds, including that Section 9.4 of the Compact barred both San Pasqual and the State from seeking compensatory damages in any action brought under the Compact.  The court granted the State's motion on that ground, denying the balance of the motion.   Judgment was entered in favor of the State on February 3, 2014.

This appeal followed.

**DISCUSSION**

San Pasqual contends the State breached the Compact by refusing to issue it the full number of gaming licenses to which it was entitled under the Compact during the license draws conducted between 2003 and 2008.  San Pasqual contends it suffered monetary damages in the form of lost profits for those years in which it could not operate its full complement of slot machines in accordance with the Compact.  San Pasqual argues the contract claim for damages is not barred by Section 9.4 because that section only waives sovereign immunity and is not a waiver of the right to damages.  San Pasqual contends the provision is therefore not relevant to any claim for breach of contract because the State enjoys no immunity for the breach of a contract to which it is a party.  We agree with the State that Section 9.4 is unambiguous, applies to this action, and bars San Pasqual's damages claim.

"We independently review an order granting summary judgment."  (*Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 504.)  The dispositive

9

issue on summary judgment below was the interpretation of Section 9.4. The trial court determined that issue as a matter of law, finding the provision was not ambiguous and that to the extent San Pasqual offered evidence to explain the meaning of the provision, it was not relevant. "The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 847.) "On issues of contractual interpretation where there is no conflicting extrinsic evidence, the appellate court is not bound by the trial court's interpretation and will decide the issue de novo." (*Ibid*.; accord, *Titan Group v. Sonoma Valley County Sanitation District* (1985) 164 Cal.App.3d 1122, 1127.)

"[W]e are permitted to consider extrinsic evidence when interpreting the Compact as a matter of law if the language of the provisions is reasonably susceptible to the interpretation of the party proffering the evidence. [Citation.] We use a two-step process to determine whether extrinsic evidence passes the reasonable susceptibility barrier." (*Colusa II*, *supra*, 618 F.3d at pp. 1075-1076.) "First, the court considers, without admitting, credible evidence concerning the parties' intentions to determine whether the language is reasonably susceptible to a party's interpretation. . . . Second, if the language is reasonably susceptible to the party's interpretation, the extrinsic evidence is admitted to aid interpreting the contract. . . . If the language at issue is not reasonably susceptible to the interpretation urged by the party, extrinsic evidence should not be considered." (*Id*. at p. 1076; accord, *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126-1127 (*Wolf*), citations omitted.)

The only extrinsic evidence of intent offered was the declaration of Allen Lawson, San Pasqual's chairperson. Mr. Lawson attested that "[a]t the time the Compact was signed [San Pasqual] did not intend to waive any right to obtain damages if San Pasqual was wrongfully refused gaming device licenses." The proffered evidence fails, under the first step of our analysis, to qualify as relevant evidence. " '[E]vidence of the *undisclosed subjective intent of the parties is irrelevant* to determining the meaning of contractual language.' [Citation.] Rather, it is the outward manifestation or expression

10

of assent that is controlling." (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 948, italics added.)

Accordingly, we are tasked with independently reviewing Section 9.4 and construing its meaning and purpose as a matter of law, without consideration of extrinsic evidence. General principles of federal contract law govern our interpretation of the Compact which was entered into pursuant to the Act. (*Colusa II*, *supra*, 618 F.3d at p. 1073.) But, "[i]n practical terms, we rely on California contract law and Ninth Circuit decisions interpreting California law because we 'discern . . . no difference between [California] and federal contract law.' [Citation.]" (*Ibid.*)

When, as here, "a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." (Civ. Code, § 1639.) The intent of the contracting parties is ordinarily a legal question determined solely by reference to the contract's terms. (*Wolf*, *supra*, 162 Cal.App.4th at p. 1126.) In other words, in reviewing a written contract, we look to the *objective manifestation* of the parties' intent as expressed by the language of the agreement. (§ 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"].) Further, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties *as it existed at the time of contracting*, so far as the same is ascertainable and lawful." (§ 1636, italics added.)

It is well established that "[p]arties may, by contract, limit the remedies available to them in the event of breach." (15 Corbin on Contracts (2003 rev. ed.) § 83.7, p. 286.) This includes agreeing "to limit or forgo certain remedies." (*Ibid.*; see also *United States v. Winstar Corporation* (1996) 518 U.S. 839, 886, fn. 30, italics added, citing Rest.2d of Contracts, § 346, comm. a (1981) [" 'Every breach of contract gives the injured party a right to damages against the party in breach' *unless 'the parties . . . by agreement vary the rules*' "]; accord, 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 855, p. 942 ["The contract may specify particular remedies to be available in the event of a breach, in addition to or in substitution for those otherwise afforded by law."].)

11

In relevant part, Section 9.4(a) of the Compact provides: "In the event that a dispute is to be resolved in federal court or a state court of competent jurisdiction as provided in this Section 9.0, the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that: [¶] (1) The dispute is limited solely to issues arising under this Gaming Compact; [¶] (2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought); and [¶] (3) No person or entity other than the Tribe and the State is party to the action."

Section 9.4(a)(2) of the Compact by its plain terms is a waiver of damages provision. San Pasqual contends the placement of the damage waiver language after the phrase "provided that" reflects an intent by the parties to limit its application to only those actions where a waiver of sovereign immunity and consent to suit is required. San Pasqual argues since the State is not immune from liability for breach of the Compact, it has no immunity to waive, so the waiver of damages does not apply.

San Pasqual relies primarily on *Hall v. University of Nevada* (1972) 8 Cal.3d 522 (*Hall*), a case involving a claim of sovereign immunity from *tort* liability. We emphasize, the case did not involve a contractual waiver of liability for damages. There, the Supreme Court reversed an order quashing service on the state of Nevada and its university. (*Id*. at p. 523.) A California resident had sued the two defendants for damages arising from an auto accident caused by a university employee driving a university-owned car in California within the course and scope of his employment. (*Ibid*.) The Supreme Court concluded that Nevada did not enjoy sovereign immunity from suit in California for such a claim. (*Id*. at p. 524.) In so concluding, the Supreme Court found it unnecessary to consider the parties' dispute whether Nevada had "abrogated sovereign immunity by statute," or whether the statute in dispute only permitted suits in Nevada, because there was no immunity from liability for Nevada's activities in California. (*Id*. at p. 526, fn. 4.) "[T]he extent to which Nevada has waived

12

immunity by statute and the extent, if any, to which it can or has limited the statutory waiver is immaterial." (*Ibid*.)

Hall did not involve parties to a written contract who had negotiated specific provisions for the waiver of immunity provided there was no claim for monetary damages. We do not find *Hall* instructive at all, nor do we agree with San Pasqual's characterization of Section 9.4(a) of the Compact. Giving the damage waiver provision a fair reading, we find it to be an unambiguous *bilateral* provision, applicable when either party resorts to a judicial forum for resolving any dispute arising under the Compact. Such a construction is reasonable given the context surrounding the formation of the Compact entered into by two independent sovereigns. Section 9.4 must be viewed within that broader context. (Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"].)

By design, the Act limits the permissible negotiating topics between a state and a tribe "in order to ensure that tribal-state compacts cover only those topics that are related to gaming and are consistent with [the Act's] stated purposes." (*Rincon Band of Luiseno Mission Indians of the Rincon Reservation v. State of California* (9th Cir. 2010) 602 F.3d 1019, 1028-1029, fn. omitted.) Of relevance here, the Act expressly identifies "remedies for breach of contract" as one of the permissible negotiating topics for the parties to resolve in crafting a tribal compact. (25 U.S.C. § 2710(d)(3)(C)(v); see also, *Rincon*, at pp. 1027-1029, 1039 ["[The Act] anticipates a very specific exchange of rights and obligations"].) As the Supreme Court recently noted, a tribal compact under the Act "typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, *and provides remedies for breach of the agreement's terms*." (*Michigan v. Bay Mills Indian Community* (2014) __ U.S. __ [134 S.Ct. 2024, 2028-2029], italics added (*Bay Mills*).)

Both Section 1.0 and Section 9.1 acknowledge the import of the fact the Compact is an agreement between two sovereign entities. Section 1.0 provides in relevant part that the "terms of this Gaming Compact are designed and intended to: [¶] (a) Evidence the goodwill and cooperation of [San Pasqual] and State in fostering a mutually respectful

13

government-to-government relationship that will serve the mutual interests of the parties." Section 9.1, the first paragraph of the dispute resolution section, provides: "In recognition of the government-to-government relationship of [San Pasqual] and the State, the parties shall make their best efforts to resolve disputes that occur under this Gaming Compact by good faith negotiations whenever possible."

Section 9.0 of the Compact contains detailed dispute resolution procedures with a clear emphasis on good faith meet and confer efforts and informal dispute resolution, and an avoidance of protracted court litigation. Section 9.1 outlines, as a "threshold" requirement, a meet and confer process as the first stage in resolving disputes "in order to foster a spirit of cooperation and efficiency in the administration and monitoring of performance and compliance by each other with the terms, provisions, and conditions of this Gaming Compact." If those efforts failed, the parties would attempt voluntary non-judicial dispute resolution alternatives. (Secs. 9.2 & 9.3.) If necessary or where emergency relief was deemed appropriate, the parties could seek redress in a judicial forum. (Secs. 9.1(d) & 9.4.)

In the event resort to court action was necessary, Section 9.4 of the Compact provides that "the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they *may* have." The use of "may" evinces the parties' acknowledgment that both parties may not have complete or even partial immunity for all potential disputes. But, for those disputes authorized by the Compact that require resort to a judicial forum, the parties agreed to waive whatever immunity they "may" have, provided that the suit was limited to issues under the Compact, neither side sued for monetary damages, and there was no third party.

The fact Section 9.4 is titled "Limited Waiver of Sovereign Immunity" is not determinative of the scope of the provision. The language of the section, and its context within the larger Section 9.0, is more illuminating of the parties' intent. A bilateral damage waiver provision is more consistent with the dispute resolution scheme created by the parties, than the alternative urged by San Pasqual.

14

It is true that the State ordinarily does not enjoy any sovereign immunity for breaches of contract. (See generally, *Souza & McCue Construction Co. v. Superior Court of San Benito County* (1962) 57 Cal.2d 508, 510.) But, San Pasqual does. " 'As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. [Citations.]' (*Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc*. (1998) 523 U.S. 751, 754.) This immunity extends to a tribe's commercial activities. (*Id*. at p. 760.)" (*Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1191; see also *Bay Mills, supra,* 134 S.Ct. at p. 2028.) In enacting the Act, Congress provided only a narrow waiver of *tribal sovereign immunity* to allow a state to bring a federal court action solely to enjoin gaming activity on tribal land being conducted in violation of a tribal compact. (25 U.S.C. § 2710(d)(7)(A)(ii); see also *Bay Mills*, pp. 2030-2032, 2034, fn. 6.)

If San Pasqual's construction of Section 9.4 were credited, a provision unequivocally drafted with bilateral language would, in practical effect, be wholly one-sided. San Pasqual would be free to seek unlimited damage claims against the State for alleged breaches of the Compact, but the State would not have the ability to seek damages in any context. Such an outcome is at odds with the clear intent manifested by the parties' language that their dispute resolution efforts would be focused on facilitating the good faith performance of the Compact in order to allow for the operation of gaming on tribal lands in accordance with the letter and spirit of the Act. Our construction of Section 9.4 gives effect to the stated purposes of the Compact and effectuates the mutual interests of San Pasqual and the State. San Pasqual's lopsided construction of the provision does not.

San Pasqual's remaining arguments do not merit lengthy discussion. San Pasqual argues that the following language in Section 9.3 defeats Section 9.4 from operating as a general waiver of damages: "This Section 9.0 may not be construed to waive, limit, or restrict any remedy that is otherwise available to either party, nor may this Section be construed to preclude, limit, or restrict the ability of the parties to pursue, by mutual agreement, any other method of dispute resolution." The focus of Section 9.3 is other

15

nonjudicial dispute resolution alternatives.  In contrast, the focus of Section 9.4 is a lawsuit in federal or state court.  "Specific terms of a contract govern inconsistent, more general terms."  (*Idaho v. Shoshone-Bannock Tribes* (9th Cir. 2006) 465 F.3d 1095, 1099.)

San Pasqual's contention that Section 9.4 must be construed against the State as the "drafter" of the Compact is not persuasive.  San Pasqual argues the State prepared the final draft of the Compact, and presented it to San Pasqual on a "take it or leave it" basis.  The State counters that substantially identical immunity and damage waiver language was included in the model compact that San Pasqual, as a member of the Committee, proposed as its initial draft in opening negotiations with the State in early 1999.[3]

Civil Code section 1654 provides:  "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  However, the rule is inapplicable "where it does not appear who caused the uncertainty . . . . [citations], or where the language is so clear that no uncertainty exists to be resolved by such construction  [Citations.] Moreover, the rule applies only as a tiebreaker when the other canons of construction fail to dispel the uncertainty."  (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 757, pp. 849-850.)  This rule of construction does not apply, first, because the disputed Compact language is not uncertain and, second, because the State did not cause the waiver of damages to be included in the Compact.

---

[3]    Section 9.4 of the model compact, also titled "limited waiver of sovereign immunity," read, in relevant part, as follows:  "In the event that a dispute is to be resolved in federal court or a court of competent jurisdiction as provided in Section 9.1, the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have, provided that:  [¶]  (1) The dispute is limited solely to issues arising under this Gaming Compact;  [¶]  (2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, or declaratory relief is sought); and  [¶]  (3) No person or entity other than the Tribe and the State are parties to the action."  (Gov. Code, § 98004.)

San Pasqual also fails to show Section 9.4 is unconscionable. Indeed, the record shows the provision was part of a compact that was crafted initially by a tribal coalition, the final version was the end result of months of negotiations, and Section 9.4 is bilateral, imposing mutual rights and obligations on both parties. It does not purport to exempt the State from violations of law as asserted by San Pasqual.

San Pasqual's citation to the Indian canon of construction is equally unavailing. Treaties and agreements between the *federal* government and Indian tribes are generally construed in the tribe's favor. (*United States v. Confederated Tribes of the Colville Indian Reservation* (2010) 606 F.3d 698, 708-709.) The rule of construction is also applied to the interpretation of ambiguous federal statutes enacted for the benefit of Indian tribes. (*Artichoke Joe's California Grand Casino v. Norton* (9th Cir. 2003) 353 F.3d 712, 728-729.) The rule is " ' "*rooted in the unique trust relationship between the United States and the Indians*." ' [Citation.]" (*Id.* at p. 729, italics added.) San Pasqual has not cited any authority for the application of the rule to the interpretation of a written contract between *a state* and a tribe. In any event, we have concluded Section 9.4 is not ambiguous and we need not resort to this rule of construction.

Finally, San Pasqual offered evidence that a compact entered into between the State and another tribe *in 2012* contains language evincing a clear intent to waive damages, in contrast to the provision contained in the Compact. San Pasqual argues the provision in that other tribal compact lends credence to its contention the parties never intended Section 9.4 to operate as a general waiver of damages. However, Section 15.3 of the Compact provides: "Neither the presence in another tribal-state compact of language that is not included in this Compact, nor the absence in this Compact of language that is present in another tribal-state compact shall be a factor in construing the terms of this Compact." The compact with another tribe executed by the State 13 years *after* the execution of the Compact with San Pasqual is therefore not relevant to interpreting Section 9.4. We have not considered it.

**DISPOSITION**

The judgment entered in favor of defendants and respondents the State of California and the California Gambling Control Commission is affirmed. Defendants and respondents shall recover their costs on appeal.

GRIMES, J.

WE CONCUR:

FLIER, Acting P. J.

OHTA, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 10/23/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SAN PASQUAL BAND OF MISSION INDIANS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>Defendants and Respondents. | B254870<br><br>(Los Angeles County<br>Super. Ct. No. BC431469)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION AND DENYING PETITION FOR REHEARING**<br><br>**[No change in judgment]** |

THE COURT:

The opinion in the above-entitled matter filed on October 5, 2015, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

Appellant's petition for rehearing is denied.

There is no change in the judgment.

_____

FLIER, Acting P. J.                    GRIMES, J.                    OHTA, J.*

—————————————

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19