Filed 10/2/20  Klein v. Safyari CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JOE KLEIN, | B280661, B282572 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC498733) |
| v. | |
| BEN SAFYARI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gregory Keosian, Judge.  Modified and affirmed.

Bahar|Law Office and Sarvenaz Bahar for Defendant and Appellant.

Davidovitch Stein Law Group, Niv V. Davidovich and Mark S. Oknyansky for Plaintiff and Respondent.

_____

Ben Safyari appeals from a judgment against him following a jury trial.

Safyari and respondent Joe Klein were partners in a venture to develop several parcels of real estate. Klein acquired the properties and began development. Unfortunately, the economic situation in 2008–2009 made construction financing difficult to obtain. Klein promised Safyari a 20 percent interest in the profits from part of the project if Safyari could find a construction loan. Klein later increased Safyari's interest to 50 percent of the entire project in return for a $400,000 loan that Safyari said he had procured to pay off an existing loan that was in default.

Evidence at trial showed that Safyari lied about the source of this $400,000 loan and concealed from Klein the only construction loan commitment that Safyari was able to procure. Safyari told Klein that his cousin had loaned the $400,000 at 20 percent interest; in reality Safyari had borrowed the money from his own equity line at 4.75 percent interest. Safyari also falsely claimed that his cousin demanded that Safyari be given a 50 percent interest in the profits from the project in return for the loan. And Klein testified that Safyari never told him about the one construction loan Safyari was able to arrange, even though Klein was desperate for a construction loan to build the planned houses.

Safyari eventually sold his interest in the project to an acquaintance of Klein's, Albert Malka,[1] recouping the $400,000 he had put into the project along with an additional $401,000 in

[1] Malka was originally a defendant in this action but settled before trial.

promissory notes from Malka and Klein.  Klein provided notes worth $301,000 for the ostensible purpose of paying outstanding interest on the purported loan from Safyari's "cousin."

The jury returned a special verdict in favor of Klein on his claims against Safyari for breach of contract, breach of fiduciary duties, and fraud, awarding total compensatory damages of $1,058,000 and punitive damages of $42,000.  The trial court subsequently ordered an offset of $281,250 based upon value that Klein received from his settlement with Malka, resulting in a final judgment against Safyari of $818,750.

On appeal, Safyari argues that:  (1) the jury's special verdict was inconsistent in finding that Klein failed to mitigate his damages while identifying no damages that Klein could have avoided; (2) the trial court erred in excluding evidence relating to interpretation of indemnification provisions and the profitability of the development project; (3) the indemnification provisions should be interpreted to bar Klein's claims against Safyari; (4) the damages the jury awarded for Klein's promissory notes to Safyari were speculative, as those notes remain unpaid; and, (5) the compensatory damages the jury awarded for the loss of Klein's right to be reimbursed for his precontract expenses should be reduced by half.

We agree with Safyari's last two arguments.  The contract terms do not support the jury's award of the full amount of Klein's precontract expenses.  Klein's damage theory was that he lost the right to be reimbursed for his precontract expenses because he was forced to make a deal with Malka after Safyari failed to honor his commitments.  The Klein/Safyari deal treated Klein's precontract expenses as a partnership expense, even though those expenses occurred before the partnership.  The

3

Klein/Malka deal did not. But in the Klein/Safyari deal, Klein's precontract expenses would have been paid with partnership funds. Half of those partnership funds would have been Safyari's. So Klein actually lost only the right to payment of half his precontract expenses.

With respect to the jury's award of $301,000 for Klein's promissory notes to Safyari, the evidence does not support any damages. Klein has not actually suffered any financial loss because he has not yet paid Safyari anything on those notes. However, the jury's finding that Safyari procured those notes through fraud does support a declaration that the notes may not be enforced. Klein requested such relief, and the evidence supports it.

We therefore will modify the judgment to: (1) reduce the damages by $679,500 (including $378,500 in damages for Klein's precontract investment and $301,000 for Klein's promissory notes to Safyari); and (2) declare Klein's promissory notes to Safyari to be invalid and unenforceable.

## BACKGROUND

### 1.    The Properties[2]

In around 2007, Klein acquired two properties in the Hollywood Hills to develop. One property (Multiview) permitted only a single house, but Klein planned to obtain regulatory approval to adjust the lot line to allow street access, which would permit building two houses. Klein intended to build another

---

[2] We summarize the facts by interpreting the evidence in favor of Klein as the prevailing party. (See *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 387.)

4

house on the other property (Mulholland), for a total of three houses to sell.

Klein met Safyari in 2007 when Klein retained him as an "expediter" to help obtain approval for the lot line adjustment on Multiview and to obtain building permits. In addition to his work with Klein, Safyari worked full time as an engineer with the California Department of Transportation. He also had another side business consulting as a civil engineer.

Klein and Safyari were successful in obtaining a modification of the lot line on Multiview to permit construction of two houses. They also obtained building permits for construction of the houses.

Unfortunately, the Great Recession intervened, and by 2009 Klein was out of money.

Klein had obtained two loans for the development project: one from "Story Lending Financial" (Story) for $300,000 (the Story loan) and one from West Coast Financial for $120,000. The Story loan was secured by the Multiview and Mulholland properties.

Klein had originally arranged to obtain a construction loan from Story to fund the home construction, but Story backed out in 2008. Due to Klein's own difficult financial and credit situation and the state of the economy, Klein was unable to find another construction loan.

Safyari offered to find a construction loan for the project in return for 20 percent of the profits from the sale of the two Multiview houses. Klein agreed, and the parties put the agreement in writing on March 9, 2009. The typed agreement contained a handwritten interlineation stating, "Ben [Safyari]

will get a construction loan to build the 2 homes for the 20% after all expenses are paid. No loan no 20%."

Klein was willing to give up 20 percent of the profits from his deal because of the pressure he felt to obtain a construction loan. The construction permits that Klein and Safyari had obtained were valid only for about a year, with the possibility of another year's extension.

**2. The Klein/Safyari Partnership**

In April 2009 Klein received a notice of default on the Story loan. Klein had not made a payment on that loan for three months.

Klein discussed the default notice with Safyari. Safyari told Klein that he might have a way to pay off the Story loan. Safyari said that he had a cousin in the Middle East who was willing to provide a loan for $400,000, which would be enough to pay off the Story loan and to maintain the properties until they obtained a construction loan. However, Safyari's cousin purportedly insisted on charging 20 percent interest on the loan as well as receiving $7,500 in points. The cousin also supposedly insisted that Safyari be made a 50 percent partner and be put on title for the properties as a 50 percent owner.

Safyari assured Klein that Safyari himself was receiving nothing on the loan. He also assured Klein that, with Safyari's connections and credit score, he should be able to arrange a construction loan in a short period of time.

In fact, there was no loan from a cousin in the Middle East. Klein learned for the first time at Safyari's deposition in this case that Safyari actually provided the $400,000 loan himself by borrowing from an equity line on his home at 4.75 percent, not 20 percent.

6

Klein and Safyari agreed on the terms of a new deal. In return for the $400,000 interim loan and for arranging a construction loan, Safyari would receive a 50 percent interest in the profits from all three houses. The project would pay the 20 percent interest and points on the purported cousin loan and would ultimately repay that loan. And, because Safyari would have his $400,000 loan returned, Klein also insisted that he be reimbursed upfront for the expenses that he had incurred before entering into the deal with Safyari (Precontract Expenses). After all expenses were paid, Klein and Safyari would split the profits equally.

Klein and Safyari included most of these terms in two substantially identical written agreements, one in July 2009 and one in February 2010 (the February 2010 Agreement.)[3] The February 2010 Agreement identified $757,000 in Precontract Expenses for which Klein would be reimbursed before the parties would split the profits.[4]

---

[3] The written agreements did not refer to Safyari's obligation to obtain a construction loan. However, Klein testified that he would not have entered into the deal with Safyari without Safyari's commitment to obtain such a loan. Klein explained that he would have simply sold one of the properties instead. Klein claimed at trial that the parties' contract was partially oral and partially written, and that Safyari breached the contract and defrauded Klein by failing to bring a construction loan to the project and by lying about his efforts to do so.

[4] Klein was to be paid $500,000 for his investment in Multiview, $217,000 for his investment in Mulholland, and $40,000 for money he borrowed to finish the construction permits.

### 3.    The Adler Loan

Klein referred Safyari to Lane Adler, a mortgage broker, as a possible lead for a construction loan.  In September 2010 Adler obtained approval for a construction loan of $2 million from Mid Valley Financial.  Adler discussed the loan with Safyari, who expressed interest.  Safyari later asked Adler to increase the loan commitment so that construction could proceed on both the Multiview and Mulholland lots at the same time.

Adler was successful in obtaining a larger loan in November 2010.  However, one condition for the increased loan amount was that Safyari agree to use his personal residence as security.  Safyari told Adler that his wife was uncomfortable with this condition and asked Adler to speak with his wife about it.  Adler did so.  Safyari continued to move forward with the loan after that conversation.

Once the loan was approved and Adler was ready to have the loan documents prepared, Safyari failed to respond to Adler's calls and e-mails.  Adler tried to reach him for three or four weeks without success.  Adler eventually received a letter from Safyari's attorney claiming that Adler had never arranged the loan.  Adler finally sued Safyari to enforce his commission agreement and obtained a judgment against him.

Safyari never told Klein about the loans that Adler had arranged.[5]

---

[5] Safyari claimed that he did tell Klein about the Adler loans, and that Safyari turned down the loan because Klein was against it.  Presumably the jury did not believe that testimony.

## 4.    The Land Loan Proposal

Meanwhile, without a construction loan, the project was again in difficult financial circumstances.  When the Mulholland property was threatened with foreclosure, Safyari presented Klein with a proposal for a land loan to avoid the foreclosure.[6]  However, that loan would have been even more expensive than the existing loan, and the parties still would have needed to obtain a construction loan to complete the project.  Klein therefore rejected the proposal.[7]

## 5.    The Klein/Malka Deal

Around this same time, Safyari told Klein that he wanted out of the deal.  Klein was acquainted with Malka from his children's school.  Malka lived near the Multiview property, and Klein spoke with him about the development project.  Malka said he was sure he could get a construction loan.  Klein told Safyari that Malka was interested in the project.

Malka and Safyari negotiated apart from Klein.  Malka and Safyari reached a deal, and all three parties then signed a written agreement dated February 20, 2011 (the February 2011 Agreement).

In that agreement, Malka agreed to buy Safyari's 50 percent ownership interest in the three properties for

---

[6] Klein explained that a land loan is a loan secured by the property itself and is not for the purpose of funding construction.

[7] The land loan proposal was referenced in an e-mail from Klein that described the proposal as a "land loan" and explained that a construction loan would still be necessary.  Safyari nevertheless testified that this e-mail actually referred to the Adler loan and was evidence that Klein rejected that loan.  Again, the jury presumably did not believe that testimony.

$500,000, including a payment of $400,000 and a promissory note for $100,000 to be paid upon completion of the construction and sale of the Multiview properties.  Klein agreed to give Safyari three promissory notes of $100,000 each, payable upon completion of construction and sale of each of the three properties.  Klein testified that he agreed to the three promissory notes because Safyari told him that was about the amount of interest that would be due on the purported loan from his cousin.

Like the February 2010 Agreement between Klein and Safyari, the February 2011 Agreement between Klein and Malka provided for a 50–50 partnership.  However, unlike the February 2010 Agreement, the February 2011 Agreement did not give Klein the right to be reimbursed for his Precontract Expenses.

In paragraph 9 of the February 2011 Agreement, Klein and Safyari agreed to "declare and disclose" to Malka "all existing, and future obligations, liabilities and any liens that may exist on the three (3) subject land properties."  Paragraph 11 of that agreement then provided that Klein and Malka "shall indemnify [Safyari] from any prior, existing and future obligations against the three (3) subject properties mentioned above, unless it was not declared and disclosed from provision 9."

On March 11, 2011, Klein and Safyari subsequently signed another agreement (the March 2011 Agreement) that again outlined the basic terms of the deal, including the $300,000 in promissory notes that Klein agreed to give Safyari.  The March 2011 Agreement contained a similar indemnification provision.

Also on March 11, 2011, Klein executed the three promissory notes in favor of Safyari.[8]

## 6. Proceedings in the Trial Court

Klein's claims against Safyari for breach of contract, fraud, and breach of fiduciary duty were tried to a jury in 2016. The jury returned a special verdict that found in Klein's favor on each of his claims.

The jury awarded damages of $757,000 on Klein's breach of contract claim, representing the amount of Klein's Precontract Expenses identified in the February 2010 Agreement. The jury awarded damages of $301,000 on Klein's claim for fraud by misrepresentation (reflecting the amount of the promissory notes to Safyari), and $1,058,000 on each of Klein's claims for fraud by concealment and breach of fiduciary duty (reflecting the combination of damages for Klein's Precontract Expenses and the promissory notes). The jury also found that Safyari "engage[d] in the conduct with malice, oppression, or fraud by clear and convincing evidence."

With respect to each of Klein's claims, the jury answered "yes" to the question, "Did Joe Klein fail to mitigate his damages?" However, with respect to each such claim, the jury also responded to the next question, "What is the amount of damages that Joe Klein could have reasonably mitigated" by writing a zero. The trial court denied a motion by Safyari to clarify these answers, concluding that the jury could have reasonably found that Klein failed to mitigate his damages, but

---

[8] Two of the notes were for $100,000 and the third was for $101,000.

11

that "there wasn't sufficient evidence to make a monetary award as to the amount mitigated."

To avoid duplication of damages, the parties stipulated that the damages the jury awarded on each claim should be combined into a total of $1,058,000 in compensatory damages. In the punitive damages phase of trial, the jury awarded damages of $42,000.

Following posttrial motions, the trial court reduced the damages by $281,250 to account for an offset from the Malka settlement. The trial court consequently entered judgment in Klein's favor for total damages of $818,750.

## DISCUSSION

## 1. The Jury's Special Verdict Was Not Ambiguous or Inconsistent

Safyari argues that: (1) the trial court should have directed the jury to "correct or clarify its ambiguous verdict"; (2) this court should interpret the verdict to mean that Klein is entitled to *no* damages because Klein failed to mitigate; and (3) alternatively, if we are not able to interpret the verdict, we should reverse and remand for a new trial.

We review for abuse of discretion the trial court's decision not to ask the jury for clarification of its verdict. (*McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 91.) However, we review the correctness of the verdict de novo. (*Ibid.*) Because the correctness of the verdict bears upon the trial court's decision not to ask for clarification, we consider that issue first.

Safyari argues that by entering a zero in response to the question asking for "the amount of damages that Joe Klein could have reasonably mitigated," the jury must have meant that Klein was entitled to no damages. He therefore requests that we

12

interpret the verdict in that manner and reverse the jury's damage award.

We reject the request. The interpretation that Safyari suggests is unreasonable in light of the wording of the question and the relevant instructions.

The verdict form asked what damages Klein could have mitigated, not what damages he was entitled to recover. Moreover, the trial court specifically explained the form in responding to a jury question during deliberations. The jury sent a note during deliberations asking for "clarification on the wording" of the questions on the verdict form concerning whether Klein had mitigated his damages. In response, the court explained that, if the jury found that Klein failed to mitigate his damages, the jury would then "need to calculate the damages defendant showed plaintiff *could have avoided.*" (Italics added.)

We presume that the jury followed the instructions it was given. (*People v. Avila* (2006) 38 Cal.4th 491, 575.) The jury could not have reasonably interpreted a question asking what damages Klein "could have avoided" to be a question about the damages that the jury actually intended to *award*.

Moreover, the jury did award damages. It did so in response to the straightforward question, "What are Joe Klein's damages?" Then, at the beginning of the punitive damage phase of trial, the jury was instructed that "[y]ou have awarded or made an award in this case due to the plaintiff and that award is the one amount that is one million, fifty-eight thousand dollars. So that is the judgment at this time in the case." The jury did not ask any question about this instruction, which would have been likely if the jury had actually intended to reduce Klein's compensatory damages to zero. Thus, the jury instructions, the

13

questions on the verdict form, and the jury's conduct all contradict the interpretation of the verdict form that Safyari urges.

Safyari also argues that if we do not adopt the interpretation of the special verdict that he suggests, the jury's answers to the questions on mitigation were hopelessly inconsistent, requiring a new trial. We also reject that argument.

A special verdict is inconsistent "if there is no possibility of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.) The jury's answers here can be reconciled.

The jury's answers were not contradictory on their face. As the trial court correctly concluded, the jury could logically have found both that Klein failed to mitigate his damages and that Safyari failed to prove that Klein could have avoided any specific amount of loss.

Thus, the jury's verdict was inconsistent only if the evidence was insufficient to support such a finding. (See *Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1320–1323 (*Ciolek*) [analyzing the trial record to determine whether sufficient evidence supported the jury's special verdict where the jury's answers were not factually inconsistent].)

The record contains sufficient evidence to support a consistent verdict. The evidence suggests several ways that Klein could have *tried* to avoid his losses, but without any proof that his attempts would have been successful.

Klein's losses resulted from the need to enter into the deal with Malka. Klein could have made several decisions that would have avoided at least the immediate need for that deal.

For example, the jury might have found that Klein should have taken steps to generate working capital to keep the development project alive without entering into the Malka deal. Klein testified that he always had the option of selling one or more of the properties to pay expenses. As mentioned, Safyari also presented Klein with the option of obtaining a land loan just prior to the deal with Malka. The jury could have concluded that selling one of the properties or accepting the land loan would have cured the immediate problem of threatened foreclosure on the Mulholland property, and therefore would have avoided the need to enter into the deal with Malka.

However, there was no evidence concerning how long the money generated from such a sale or loan would have lasted, and no proof that the money ultimately would have enabled Klein to complete the development. Klein testified that, even if he had sold one property, he still would have needed a construction loan. Likewise, if Klein had agreed to accept the land loan that Safyari proposed, Klein still would have needed to find a construction loan to complete the development. Safyari did not provide any evidence that the parties would have been successful in arranging a construction loan in sufficient time to finish the project.[9] Their previous difficulties in finding such a loan suggest that the prospects were uncertain.

---

[9] Indeed, Safyari never attempted to prove that Klein could have mitigated his damages at all. Rather, Safyari defended the case by disputing liability. Safyari's theory was that the Malka deal was not necessary because Safyari never deceived Klein or breached his agreement with him. Safyari claimed that he arranged the Adler loan but that Klein did not

Or perhaps the jury concluded that Klein should have been more active in protecting his own interests. For example, the jury might have believed that Klein did not sufficiently monitor Safyari's work and should not have simply accepted Safyari's claim that Safyari was spending "thousands of hours" on obtaining a construction loan without success (especially since Safyari had two other jobs at the time). Or the jury might have found that Klein should have participated in the negotiations for the Malka deal and demanded an expense reimbursement provision rather than leaving the negotiations to Malka and Safyari. However, if the jury did find that Klein should have made greater efforts to look out for his own interests, it might also have concluded that the likely results of such hypothetical efforts were impossible to discern from the evidence that Safyari offered.

Thus, there was sufficient evidence to support factual theories that logically explain the jury's verdict. The verdict is therefore not inconsistent. (See *Ciolek, supra,* 237 Cal.App.4th at p. 1323 ["Given the record actually developed at trial, it cannot be said that the special verdict was inconsistent or the findings made therein were not supported by substantial evidence"].)

Because the jury's answers to the questions concerning mitigation of damages can be reconciled, there is no ground to reverse for a new trial. And because the special verdict was neither ambiguous nor inconsistent, the trial court did not abuse

---

want to accept it. In contrast, Klein claimed that Safyari breached the contract and engaged in fraud in part by concealing the Adler loan from him. The jury's verdict shows that it believed Klein.

16

its discretion in denying Safyari's request to ask the jury to clarify the verdict.

## 2. The Trial Court's Evidentiary Rulings Do Not Provide a Ground for Reversal

Safyari argues that, even if the jury had insufficient evidence to calculate the amount of damages that Klein could have mitigated, the absence of such evidence was due to erroneous evidentiary rulings. Safyari claims that the trial court improperly excluded evidence of "Klein's post-joint venture financial state," which Safyari claims the jury could have used to calculate the losses that Klein could have avoided.

Safyari also argues that the trial court erred in excluding testimony concerning the meaning of the indemnification provisions in the February 2011 Agreement and the March 2011 Agreement. Safyari claims that such testimony would have supported his contention that the indemnity provisions operated to release the claims that Klein asserted against him in this lawsuit.

We review the trial court's decision to exclude evidence for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) As discussed below, Safyari has not shown that the trial court abused its discretion in any of its evidentiary rulings.

### a. *Testimony concerning profitability of the development project*

Safyari did not show at trial, and has not demonstrated on appeal, that the financial results of the development project were relevant to any particular theory of mitigation. Indeed, as discussed above, Safyari did not pursue *any* theory of mitigation at trial, but claimed instead that he fulfilled his obligation to find a construction loan. That was a defense to liability on Klein's

17

breach of contract and fraud claims, not a theory of mitigation. In any event, the jury's verdict shows that it rejected the defense.

The financial benefit that Klein received from the development project *might* have been relevant if Safyari had intended to compare it with the results of some particular decision Klein could have made to mitigate his loss. For example, if Klein had sold one of the properties and then successfully completed the project with Safyari, Klein could have avoided the deal with Malka and retained the right to recover his Precontract Expenses. But that gain might have been offset by the loss of profits that Klein would otherwise have enjoyed by developing the property that he sold. In that event, it might have been necessary to compare the actual profits from the completed development project to the profits that Klein would have received had he sold one of the properties.

However, Safyari did not argue that theory or any other theory of mitigation that would have required the jury to consider the profits Klein ultimately received from the project. Safyari cannot complain that the evidence the trial court excluded was relevant to a theory that he did not pursue.

Moreover, even if actual profits from the project were relevant to some theory of mitigation, Safyari's failure to explain the relevance of the evidence during trial precludes him from claiming error on appeal. An appellant may not argue that the exclusion of relevant evidence was prejudicial error if the appellant never told the trial court why the evidence should be admitted. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282 (*Shaw*) ["the failure to make an adequate offer of proof in the court below ordinarily precludes consideration on appeal of an allegedly erroneous exclusion of evidence"].)

18

### b. *Testimony concerning the indemnification provisions*

The trial court sustained several objections to questions of Klein and Safyari concerning their understanding of the indemnification provisions in the February 2011 Agreement and the March 2011 Agreement. The trial court did not abuse its discretion in making these rulings.

The objections concerned questions that asked the witnesses to interpret the language of the written agreements and to explain their own understanding of what that language meant. Such testimony was irrelevant.

" ' "[E]vidence of the *undisclosed subjective intent of the parties is irrelevant* to determining the meaning of contractual language." ' " (*San Pasqual Band of Mission Indians v. State of California* (2015) 241 Cal.App.4th 746, 757 [testimony by the chairperson of a party that the party did not intend to waive any right to obtain damages in agreeing to a contractual provision was irrelevant to interpretation of the contract], quoting *Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 948 (*Berman*); see *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 12 [testimony by counsel for a party that his intent in drafting a release was that it would apply to the defendant was irrelevant, as there was "no evidence counsel expressed this intention to anyone"].)

That is because California recognizes the objective theory of contracts. Under that theory, "it is the outward manifestation or expression of assent that is controlling." (*Berman, supra,* 56 Cal.App.4th at p. 948.) This means that, in interpreting a contract, " '[t]he true, subjective, but unexpressed intent of a party is immaterial and irrelevant.' " (*Ibid.*, quoting *Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 690.)

19

The jury instructions in this case explained that principle. The trial court instructed the jury that, in deciding whether a contract was created, "You may not consider the parties' hidden intentions."

The trial court did not abuse its discretion in sustaining objections to irrelevant evidence. Moreover, Safyari never explained to the trial court what *admissible* testimony he expected to obtain by asking the parties about their understanding of the indemnification provisions. As discussed above, a trial court's ruling excluding evidence generally cannot be reviewed on appeal in the absence of an offer of proof concerning what the evidence would be. (See *Shaw, supra,* 170 Cal.App.4th at p. 282.)

Safyari argues that no offer of proof was necessary here because the trial court "categorically" excluded evidence relating to interpretation of the indemnity provisions. (See *Beneficial Fire & Casualty Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 522 [an offer of proof is unnecessary "[w]here an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue"].) The record does not support that argument.

The record does not show that the trial court stated, or even suggested, that it would exclude *all* parol evidence concerning the meaning of the indemnification provisions. The trial court merely sustained objections to specific questions asking Klein or Safyari to interpret the language of the written agreements. As discussed above, such testimony was irrelevant. The trial court's rulings excluding irrelevant evidence do not show that the trial court would have sustained objections to

20

questions seeking relevant testimony, much less that the court intended to exclude all parol evidence.

In lieu of a proffer, Safyari cites his testimony, later stricken, explaining his understanding that the March 2011 Agreement "ends our relationship and, you know, we forget about past and this is like release of—releasing each other from any obligations."[10]  Again, this testimony merely described Safyari's subjective understanding of the indemnification provision, which was itself irrelevant.  Safyari did not provide any proffer of *admissible* parol evidence concerning communications among the parties that might have assisted the jury in interpreting the indemnification provision.

3.     **The Indemnification Provisions in the February 2011 and March 2011 Agreements Do Not Preclude Klein's Claims**

Interpretation of a contract is a judicial function when there is no disputed extrinsic evidence.  (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 (*Parsons*).)  As discussed above, the trial court did not improperly exclude extrinsic evidence concerning the parties' uncommunicated subjective intent.  Safyari does not identify any other disputed extrinsic evidence.  We therefore interpret the indemnification provisions de novo as an issue of law.  (*Id.* at p. 866.)

Safyari argues that the indemnification provisions should be interpreted to indemnify Safyari against all of Klein's claims. The trial court rejected that argument, concluding that the indemnity provisions "clearly pertain[ ] only to obligations and

---

[10] In his opening brief, Safyari erroneously attributes this stricken testimony to Klein.

liens relating to the properties, not to claims by Klein against Safyari himself for fraud." We agree.

The provisions in question state that Klein "shall *indemnify* [Safyari] from any prior, existing and future obligations and any liens that may exist against the three (3) subject properties." (Italics added.) "Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." (Civ. Code, § 2772.) "A clause which contains the words 'indemnify' and 'hold harmless' is an indemnity clause which generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons." (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969.)

Under Safyari's interpretation of the indemnity provisions, the "conduct" that Klein agreed to indemnify Safyari against was Klein's *own* conduct in bringing a lawsuit against Safyari. (See Civ. Code, § 2772.) Such an "indemnification" is indistinguishable from a release. Nothing in the written agreements between Klein and Safyari indicates that Klein intended to give Safyari a release for any claims that Klein might have against him for fraud, breach of contract, and the like.

The indemnification provisions are most reasonably understood to protect Safyari from third party claims that might be made against him based upon obligations incurred to develop the Mulholland and Multiview properties. That interpretation is supported by the language of the provisions.

22

Klein agreed to indemnify Safyari against obligations and liens that "may exist *against* the three subject properties."[11] (Italics added.)  Obligations "against" the properties is most logically interpreted as obligations to vendors, lenders, or other third parties that, like liens, the parties incurred in the course of developing the properties.

That interpretation is also supported by the context of the indemnification provisions.  Paragraph 9 of the February 2011 Agreement required Klein and Safyari to "declare and disclose" to Malka "all existing, and future obligations, liabilities and any liens that may exist on the three (3) subject land properties." Paragraph 11 then referred back to this disclosure obligation in providing for indemnification against any "obligation[ ]" or "lien[ ]" against the three properties, "unless it was not declared and disclosed from provision 9."  The apparent intent of these provisions was to require the existing partners—Klein and Safyari—to identify all existing obligations against the properties to the incoming partner, Malka.  Malka agreed to assume Safyari's responsibility for half the amount of those obligations,

_____

[11] It is grammatically possible to interpret the phrase "against the three (3) subject properties" to refer only to the immediately preceding term "any liens" rather than to the prior phrase "*obligations* and any liens."  (Italics added.)  But interpreting it in that fashion would mean that Klein (and Malka) agreed to a completely open-ended obligation to indemnify Safyari against "*any* prior, existing and *future* obligations."  (Italics added.)  The indemnification provisions cannot reasonably be read to include an obligation by Klein to indemnify Safyari forever against any obligation that Safyari might incur, no matter the reason or context.

and Klein and Malka agreed to indemnify Safyari, but only against those obligations that were specifically disclosed.[12]

Malka confirmed that interpretation in his testimony. Malka explained that "the deal was, whatever liabilities that are being declared at the time of the signing of the agreement between the three of us, will be carried over and being responsible between Klein and I 50 percent, 50–50." Malka specifically identified the obligations that the parties declared: "they didn't pay the architect about $34,000 that I had to pay, they didn't pay the structural engineer about $18,000 that I had to pay, they didn't pay the civil engineer that I had to pay, they didn't pay some—they didn't pay loans and payments on loans, mortgage loan on Mulholland, they were behind like over a year maybe two years of payments—that's why it went into foreclosure— and Multiview, they were behind."

There is no reason to interpret the indemnification provision in the March 2011 Agreement any differently. The February 2011 Agreement and the March 2011 Agreement were executed around the same time, and in the same context of negotiating the terms of Safyari's exit from the deal. There is

---

[12] This disclosure obligation is a further reason why interpreting the indemnification provisions to apply to Klein's own claims in this lawsuit is unreasonable. The "obligation" that Safyari claims Klein agreed to indemnify Safyari against was Klein's own claims in this lawsuit. The lawsuit of course did not exist at the time Klein executed these agreements, and there was therefore nothing to disclose. More fundamentally, the existence of this disclosure obligation undermines any conclusion that the parties intended the indemnification provisions to apply to future claims among the parties.

therefore good reason to interpret the identical indemnification language in the two agreements in the same way.  (See Civ. Code, § 1642 ["Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"]; *Torrey Pines Bank v. Hoffman* (1991) 231 Cal.App.3d 308, 320 [considering together several contracts between the parties relating to the same transaction].)

Thus, the indemnification provisions do not bar Klein's claims against Safyari in this lawsuit.

4.     **The Jury's Verdict Shows that Safyari Procured Klein's Promissory Notes Through Fraud, and Those Notes Therefore Should Be Declared Invalid and Unenforceable**

As mentioned, the jury found that Safyari committed fraud by misrepresentation and awarded damages of $301,000 on that claim.  The jury's damage award—which equals the amount of the promissory notes that Klein provided to Safyari—shows that the jury concluded those notes were the result of Safyari's fraud.[13]

A party that is defrauded with respect to a severable portion of a contract may elect to rescind only that portion. " 'Where a good cause for rescission exists as to one part of a divisible or separable contract, such portion may be rescinded in equity without disturbing the remainder.' " (*Simmons v.*

---

[13] The jury awarded $1,058,000 on Klein's claim for fraud by concealment.  The damage amount shows that the jury also awarded damages for the promissory notes on that claim along with the $757,000 in damages for Klein's loss of his Precontract Expenses ($301,000 + $757,000 = $1,058,000).

*California Institute of Technology* (1949) 34 Cal.2d 264, 275 (*Simmons*); see *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1153 ["there is no support for, and we reject out of hand, the notion that a court has no equitable power to set aside a provision of a contract procured by fraud"].)

In *Simmons,* our Supreme Court held that a license and royalty agreement between the California Institute of Technology (Institute) and a staff member/inventor, Simmons, was separable from a related license and royalty agreement between Simmons and a company, Baldwin, concerning the use of Simmons's invention. The Institute obtained its contract with Simmons through fraud, and Simmons therefore properly rescinded it. However, Simmons did not rescind the contract with Baldwin. The court concluded that "[n]o injustice is done the Institute by Simmons' failure to rescind as to Baldwin, and the Institute has incurred no injury if Simmons and Baldwin, as between themselves, elect to be bound" by their agreement. (*Simmons, supra*, 34 Cal.2d at p. 276.)

The February 2011 Agreement similarly involved separate and severable promises among three different parties. Klein's agreement to provide his three promissory notes to Safyari was severable from the terms of Safyari's sale of his interest to Malka and from the terms of the new relationship between Klein and Malka. Thus, rather than damages for Safyari's fraudulent procurement of Klein's promissory notes, Klein could have sought a judgment rescinding the notes on the basis of Safyari's fraud.

Klein apparently assumed he could not obtain rescission without amending his complaint to add a new cause of action. Klein filed such a motion to amend during trial, but the trial court denied it as untimely. In doing so the court stated that "if

26

it's in the prayer, then that's fine as part of the prayer, but I'm not going to amend the complaint to add that as a cause of action."

A request to cancel the promissory notes was in fact already in the prayer for relief in Klein's existing complaint. Klein's operative first amended complaint (Complaint) requested a judgment declaring the promissory notes to be "null and void." That relief was supported by the fraud allegations in the complaint. Safyari now concedes that Klein did not need to amend his Complaint to seek rescission of the notes because " 'rescission is a remedy, not a separate cause of action.' " (*Thompson v. Miller* (2003) 112 Cal.App.4th 327, 334.) However, rather than pressing for rescission at trial, Klein sought damages in the amount of the promissory notes on the theory that Safyari could later try to enforce those notes against him.

As a result of these events in the trial court, we are left with the strange situation in which Klein has been awarded damages to compensate him for the possibility that he might someday be required to pay Safyari on promissory notes that Safyari obtained through fraud.

Safyari argues that the possibility of such a future payment is too speculative to support the damage award. We agree.

The mere possibility of a future claim against a plaintiff as a result of a defendant's wrongful conduct is ordinarily too speculative to support a damage award, even when that claim belongs to a third party. In *Green Wood Industrial Co. v. Forcemen Internat. Development Group, Inc.* (2007) 156 Cal.App.4th 766, the court set aside damages that the plaintiff had been awarded based upon a claim asserted against it by the plaintiff's customer. The plaintiff was a reseller who had

27

received a predelivery payment from the customer for goods that the defendant seller had fraudulently promised to provide. In setting aside the damages awarded for the customer's claim, the court explained that "the existence of a mere liability is not necessarily the equivalent of actual damage. This is because the *fact* of damage is inherently uncertain in such circumstances. The fact that a third party has demanded payment by the plaintiff of a particular liability and the plaintiff has admitted such liability are not, by themselves, sufficient to support an award of damages for that liability, because that third party may never attempt to force the plaintiff to satisfy the alleged obligation, and the plaintiff may never pay the obligation." (*Id.* at p. 776.)

Here, the possibility of future damage from enforcement of the promissory notes is even more speculative, as the claim that Klein might theoretically be obligated to pay would be asserted by a defendant who obtained the claim through fraud. Moreover, the claim exists only *because* the jury awarded damages to account for the possibility that the claim might later be enforced. If the trial court had simply declared the promissory notes invalid as a result of Safyari's fraud, there would be no possibility of future enforcement. Thus, in an absurd circular fashion, the damages that the jury awarded to account for a theoretical future claim are themselves the only possible ground for such a claim.[14]

_____

[14] This court previously granted Safyari's request for judicial notice of records from a postjudgment action by Safyari to enforce the promissory notes, in which Klein apparently successfully asserted a defense based upon the judgment in this

28

As mentioned, Klein requested cancelation of the promissory notes in his complaint. On appeal, Safyari proposes similar relief as an alternative to the jury's damage award. Safyari suggests that this court "modify the judgment by striking the jury's $301,000 damage award to Klein as an offset against Safyari's right to enforce the notes."[15]

Accordingly, we will modify the judgment to: (1) set aside the jury's damage award of $301,000 on the promissory notes, and (2) declare the promissory notes invalid and unenforceable.

5.     **Klein's Damages for Reimbursement of His Precontract Expenses Must Be Reduced by Half**

This court has the power to modify the judgment to set aside the amount of damages that is not supported by the evidence. (See *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533 ["When the evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to the amount supported by the evidence"].) Safyari argues that the evidence supports only half the amount of damages that the jury awarded

---

case. Because these records concern postjudgment events, we do not rely upon them for our decision.

Klein also filed a motion requesting this court to take judicial notice of various records concerning postjudgment proceedings in which Safyari allegedly acted in bad faith. Those records are not relevant to this appeal, and we therefore deny the motion.

[15] Presumably Safyari describes this proposed relief as an "offset" against future enforcement of the promissory notes to avoid characterizing the remedy as the cancelation of the promissory notes due to Safyari's own fraud. The result is the same.

29

for Klein's loss of the right to be reimbursed for his Precontract Expenses. We agree.

The relevant evidence on this issue is the difference between the terms of the February 2010 Agreement (between Klein and Safyari) and the February 2011 Agreement (among Klein, Safyari, and Malka). If there is no disputed extrinsic evidence, interpretation of these contract terms is an issue of law. (*Parsons, supra,* 62 Cal.2d at p. 865.)

There is no dispute on the key issue here: The February 2010 Agreement gave Klein the right to be reimbursed for his Precontract Expenses before the parties split the profits, and the February 2011 Agreement did not. As discussed below, this was Klein's own theory of damages, supported by his own testimony as well as testimony from Malka. Thus, we consider de novo whether the contractual terms support the damages that the jury awarded. (*Parsons, supra,* 62 Cal.2d at p. 866.)[16]

Damages awarded for breach of contract "should, insofar as possible, place the injured party in the same position it would have held had the contract properly been performed, but such damages may not exceed the benefit which it would have received had the promisor performed." (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 468; Civ. Code, § 3358 ["Except as expressly provided by statute, no person can recover a greater amount in damages for the breach of

---

[16] Because the dispositive evidence here is the evidence that *Klein* offered on the meaning and effect of the agreements, we would reach the same result even if the substantial evidence standard of review applied.

an obligation, than he could have gained by the full performance thereof on both sides"].)

The jury awarded $757,000 in damages on Klein's breach of contract claim.[17] This was the full amount of Precontract Expenses for which Klein was entitled to be reimbursed under the February 2010 Agreement. That agreement also stated that Klein and Safyari were each "50% owner and liable for 50% expenses," and provided for an equal division of profits "[a]fter all expenses are paid."

The deal with Malka also provided for a 50 percent partnership, but without any provision to reimburse Klein for his Precontract Expenses. As discussed above, Malka explained that as part of the February 2011 Agreement, he agreed to reimburse only those expenses that Klein and Safyari specifically declared, which did not include Klein's Precontract Expenses. Klein testified consistently, explaining that he lost money because he had to enter into the deal with Malka, which required him to "forfeit my investment." Klein argued this theory of damages to the jury, claiming that he was entitled to reimbursement for the full amount of his Precontract Expenses.

However, analysis of the February 2010 Agreement and the February 2011 Agreement shows that Klein was entitled to only half of those expenses. As Safyari points out, although the expense reimbursement provision in the February 2010 Agreement entitled Klein to be reimbursed for his $757,000 in Precontract Expenses, Klein would "end up ultimately paying for half of this reimbursement when the profits were split 50/50."

_____

[17] Safyari's briefs sometimes mistakenly state this amount as $775,000.

31

This is another way of saying that the profits from the sale of the completed properties would be reduced by the amount of Klein's expense reimbursement. Because Klein was entitled to half of those profits, he would experience half the reduction. This same relationship between profits and the expense reimbursement applies to the Klein/Malka deal. Like the Klein/Safyari deal, the agreement between Klein and Malka called for the parties to split profits and expenses 50–50. However, unlike the Klein/Safyari deal, the Klein/Malka agreement did not provide for any reimbursement of Klein's Precontract Expenses. But the lack of that reimbursement obligation meant that more profits would be available for the parties to split. Klein would receive 50 percent of those additional profits. Thus, instead of Klein "paying for" his expense reimbursement in the Klein/Safyari deal by receiving his half share of profits that were *reduced* by the amount of the expense reimbursement, in the Klein/Malka deal Klein would ultimately be paid more from his half share of profits that were *increased* by the amount of the expense reimbursement.[18]

---

[18] An example helps to explain the math. Klein estimated that he would ultimately receive about $500,000 in profits from sale of the Multiview Properties alone. Assume that total profits on the development project were twice that, or $1 million, after payment of all expenses, including Klein's Precontract Expenses. If there had been no contract breach and the Klein/Safyrai deal had remained in place until the properties were sold, Klein and Safyari would have split the $1 million in profits, giving Klein $500,000. Combined with Klein's $757,000 reimbursement, Klein would have received a total of $1,257,000.

Now consider the Klein/Malka deal. Under that deal, Klein would not receive the $757,000 expense reimbursement. But

Perhaps a simpler way to understand the expense reimbursement is to consider the source of the funds that would have been used to pay it. Under the Klein/Safyari deal, Klein's Precontract Expenses would have been paid with partnership funds. Half of those partnership funds belonged to Safyari. Thus, by losing the right to be reimbursed for his Precontract Expenses, Klein actually lost only half of the amount of those expenses.

Klein argues that there was no proof that there would actually be any profits from the sale of the developed properties. But in awarding Klein damages for his lost expense reimbursement, the jury must have found there would be at least enough revenues from the development project to cover Klein's $757,000 in Precontract Expenses. There was sufficient evidence to support that finding.[19] Whether the parties received profits over that amount was immaterial.[20]

without that reimbursement, the profits available for the parties to split would be $1,757,000 ($1,000,000 + $757,000). Klein's half of that amount would be $878,500. That is $378,500 less than the amount he would have received if he had been paid the upfront reimbursement. ($1,257,000 − $878,500 = $378,500.) Of course, $378,500 is half of $757,000. Thus, Klein lost only half of his precontract expenses by entering into the deal with Malka.

[19] As mentioned, Klein estimated that he would receive a profit of $500,000 just on the Multiview properties.

[20] Again, in the Klein/Malka deal, rather than Klein receiving the $757,000 as a reimbursement, that amount would be available for the parties to split. Klein would receive $378,500 of that amount—half the amount he would have received as a reimbursement in the Klein/Safyari deal. Klein's damages would therefore be $378,500, not $757,000.

33

Klein also argues that other expenses might have remained after reimbursement of Klein's Precontract Expenses. Whether or not that could have occurred under the terms of the Klein/Safyari agreement,[21] the amount of the project's expenses is also immaterial to the calculation of damages.

The jury's verdict establishes that, absent Safyari's wrongful conduct, Klein would have received his $757,000 reimbursement through the Klein/Safyari deal. The relevant question then for purposes of the damage calculation is how the deal that Klein *has*—i.e., the Klein/Malka deal—compares to the deal that he *lost*—i.e., the Klein/Safyari deal. Under the Klein/Malka deal, the $757,000 that would have been paid to Klein from partnership funds under the Klein/Safyari deal would be split by Klein and Malka. As equal partners, Klein and Malka agreed to a split of expenses as well as profits. Klein would benefit from his 50 percent of the $757,000, whether that amount contributed to his half of the profits or reduced his half of the remaining expenses.

Thus, under Klein's own damage theory, he lost only half the amount of his Precontract Expenses by entering into the deal

---

[21] As Safyari points out, the February 2010 Agreement provided that Klein's expense reimbursement was to be paid "*after* we pay all the liens and expenses, Mortgage Payments for Mulholland Dr. and Multiview Dr. if any required, construction costs, and segments of payments to Ben's cousin . . . until Ben's cousin loan of Four Hundred Thirty Two Thousand and Two Hundred Eighty Two Dollars ($432,282.00), which has been borrowed from Ben's Cousin up to January 01, 2010, Plus 20% interest on the $432,282.00 loan from Ben's Cousin, since April 25, 2009, are paid in full." (Italics added.)

with Malka.  Klein was therefore entitled to only half the amount of those expenses as damages.

## DISPOSITION

The judgment is modified in the following respects: (1) total damages in favor of respondent Klein are reduced by $679,500 to a total of $139,250; and (2) the three promissory notes by MJK, LLC (signed by Joe Klein, Manager) in favor of Ben B. Safyari, dated March 11, 2011, and totaling $301,000, are declared invalid and unenforceable.  As modified, the judgment is affirmed.  The parties are responsible for their own costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



CHAVEZ, J.